FILED

2009 JUL 16  A 10:57

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST OF CA, S.J.

1   LAW OFFICES OF S. CHANDLER VISHER
2   S. Chandler Visher (California State Bar No. 52957)
    44 Montgomery Street, Suite 3830
3   San Francisco, California 94104
    Telephone: (415) 901-0500; Facsimile: (415) 901-0504
4   chandler@visherlaw.com

E-filing

5   CONSUMER LAW OFFICE OF MARIE NOEL APPEL
6   Marie Noel Appel (California State Bar No. 187483)
    44 Montgomery Street, Suite 3830
7   San Francisco, California 94104
8   Telephone (415) 901-0508; Facsimile: (415) 901-0504
    marie@consumerlaw.ws

ADR

9
10  PUBLIC CITIZEN LITIGATION GROUP
    Deepak Gupta (pro hac vice to be filed)
11  1600 20th Street, NW
    Washington, DC 20009
12  Telephone: (202) 588-7739; Facsimile: (202) 588-7795
    dgupta@citizen.org
13
14  Attorneys for Plaintiff

15          UNITED STATES DISTRICT COURT

16          NORTHERN DISTRICT OF CALIFORNIA

17              SAN FRANCISCO DIVISION

18
19  TAYLOR RUSSELL, on behalf of himself      No. C09  03239  PVT
    and all others similarly situated,
20
                            Plaintiff,         CLASS ACTION
21
22  v.                                         COMPLAINT TO ENJOIN IMPROPER
                                               DEBT COLLECTION AND FOR
23  UNITED STATES OF AMERICA,                  RESTITUTION OF AMOUNTS
                                               ILLEGALLY COLLECTED
24                          Defendant.
25
26
27
28

CLASS ACTION COMPLAINT                1

# NATURE OF THE CASE

1.     The Army and Air Force Exchange Service (AAFES), an instrumentality of the United States, extended credit through an AAFES Credit Program Account Agreement (AAFES Credit Agreement) to military personnel for two categories of purchases: (1) uniform clothing (UC or UCDPP) and (2) general retail purchases under a deferred payment program (DPP), from the Post Exchange stores it operates. The AAFES Credit Agreement applicable to plaintiff Russell's account is attached hereto as Exhibit 1 (AAFES – Briggs 000167 – 168).

2.     The Russell AAFES Credit Agreement gives notice in paragraph 22 that delinquent accounts are subject to administrative offset collection procedures. Pursuant to the federal law referenced in these paragraphs, the United States has the right to offset the delinquent debt against monies it owes the debtor for benefits and tax refunds. AAFES refers delinquent debt to the Department of the Treasury, which administers a centralized collection effort using administrative offsets, known as the Treasury Offset Program (TOP).

3.     The AAFES Credit Agreement changed in some particulars relevant to the action over time, but all versions provide that no finance charge shall be imposed on uniform clothing (UC) purchases. Despite this prohibition, AAFES has imposed and collected on delinquent AAFES Credit Agreement accounts a finance charge on UC purchases of approximately 5% per annum. The First Claim is brought on behalf of all AAFES debtors who were, among other things, improperly charged finance charges on delinquent UC debt.

4.     For DPP purchases, unlike UC purchases, AAFES was permitted to impose finance charges based on an annual interest rate. The Russell AAFES Credit Agreement provides in paragraph 3 that the periodic finance rate applicable to DPP purchases on the account shall be determined based on an annual percentage rate that shall not exceed the bank prime rate in effect on each monthly statement closing date plus 4.75% and shall not be lower than 12% per annum. From the time plaintiff Russell's account became delinquent in 2000 until 2005, when the first administrative offset was taken to collect on the account, the maximum annual interest rate allowed on his account was never more than 12.25% and for most months was 12%, but during that time period AAFES consistently applied an annual percentage rate in calculating the

---

CLASS ACTION COMPLAINT                    2

1   finance charge on the account in excess of 12.25%.

2       5.      The AAFES Credit Agreements issued before June of 2000 gave notice that

3   "Under the provisions of 31 U.S.C. § 3717, we will assess on a delinquent debt" administrative

4   costs and penalties.  In fact, 31 U.S.C. § 3717(g) prohibits the imposition of penalties and

5   administrative fees under the provisions of section 3717 in contracts that, like the AAFES Credit

6   Agreement, provide for interest.  Although the pre-June 2000 AAFES Credit Agreement forms

7   made reference to the amount of penalties allegedly payable through application of 31 U.S.C. §

8   3717, the Agreement itself did not provide for penalties and administrative fees if such fees were

9   not permitted by 31 U.S.C. § 3717.  Despite the fact that neither 31 U.S.C. § 3717 nor the

10  applicable contracts allowed it, AAFES imposed on plaintiff and other class members with pre-

11  June 2000 AAFES Credit Agreements a 6% annual interest penalty and administrative fees.

12      6.      The form of AAFES Credit Agreement issued to new accounts before May of

13  2005 had no provision relating to the payment by the debtor of fees charged to AAFES by

14  private collection agencies retained by AAFES to collect delinquent AAFES debt.  Despite the

15  absence of any contractual or statutory right to do so, however, AAFES added private agency

16  debt collection fees to the amount it claimed plaintiff Russell owed AAFES.

17      7.      The First Claim is brought on behalf of AAFES debtors from whom AAFES

18  improperly collected UC interest charges.

19      8.      The Second Claim is brought on behalf of AAFES debtors whose DPP balances

20  were charged finance charges higher than those permitted by the applicable AAFES Credit

21  Agreement, on whom AAFES imposed administrative fees and penalties under the authority of

22  31 U.S.C. § 3717, and/or for whom AAFES has either permitted the collection of private agency

23  debt collection fees or claimed the right to impose such fees where no such right exists.

24      9.      Plaintiff seeks a judgment (1) granting an injunction prohibiting AAFES from

25  including, in debt certifications to TOP or in any other claim of amounts due from AAFES

26  Credit Agreement debtors, interest on UC debt, improperly calculated DPP interest, penalties or

27  administrative costs and private agency debt collection fees except as provided for in the

28  applicable contract; and (2) requiring AAFES to refund improperly collected interest on UC

CLASS ACTION COMPLAINT                    3

1    debt, improperly calculated DPP interest, penalties and administrative fees, private agency debt

2    collection fees,  and (3) granting all other appropriate equitable remedies, including interest of

3    all amounts improperly collected from tax refunds and attorney fees.

## PARTIES

5        10.    Plaintiff Taylor Russell served in the United States Army on active duty from

6    April, 1997, until July, 2000.  Mr. Russell opened his AAFES account in 1998 and his AAFES

7    Credit Agreement is attached hereto as Exhibit 1 and incorporated herein by reference.

8        11.    Mr. Russell continued making payments on his AAFES account until near the

9    time of his separation from service in July of 2000.  As part of the process of separating from the

10   service, Mr. Russell met with an AAFES representative at the AAFES store located at Ft. Bliss,

11   Texas, who told Mr. Russell that he had a zero balance on his account and did not owe AAFES

12   anything.

13       12.    Plaintiff Russell was discharged from military service in July of 2000, and

14   although he had been previously told by AAFES that he had a zero balance, AAFES claims that

15   his credit account became delinquent shortly thereafter.

16       13.    Mr. Russell resides in Mountain View, California, located in the Northern District

17   of California.

18       14.    Defendant United States is the creditor on all of the AAFES credit account debt

19   collected through TOP.

## JURISDICTION AND VENUE

21       15.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C.

22   § 1346(a)(2).  Plaintiff's causes of action arise under the AAFES Credit Agreement, which, by

23   its terms, is governed by federal law.  Applicable federal law includes 31 U.S.C. § 3701 through

24   31 U.S.C. § 3720E and the regulations promulgated pursuant thereto (collectively referenced

25   herein as "FCCA" for Federal Claims Collection Act), 31 U.S.C. § 3717 under which authority

26   AAFES claims the right to impose penalties and administrative fees, and the Administrative

27   Procedure Act (APA), 5 U.S.C. § 702.

28       16.    Venue is proper in this District under 28 U.S.C. § 1391(e) and 28 U.S.C.

CLASS ACTION COMPLAINT                    4

1 | § 1402(a)(1).

## INTRADISTRICT ASSIGNMENT

Pursuant to Civil L.R. 3-2 and 3-5(b), this action could appropriately be assigned to the San Francisco Division of the Northern District of California. Venue is proper in this District because Mr. Russell resides here, but the action did not "arise" in any particular county because Civil L.R. 3-2(c) defines an action arising in the county "in which a substantial part of the events or omissions which give rise to the claim occurred." All of the transactions involved in this case occurred in Texas, where the improper interest calculations were made, and Washington, D.C., where the TOP offsets were made. All contact with the plaintiff was through the mail. The plaintiff is a resident of this district, but Civil L.R. 3-2 does not appear to make assignment based on the plaintiff's county of residence. Another class action involving AAFES improper collection practices, *Briggs v. United States,* No. CV – 07 – 5760 WHA, is now pending before Judge William Alsup, for which a Notice of Pendency of Other Action has or will be filed. The improper interest charging practices alleged here were first alleged in the *Briggs* case, but the illegal UC interest issue was made moot in the *Briggs* case when AAFES waived the plaintiff's UC interest charges and that claim was dismissed from that case.

## FACTS RELATING TO PLAINTIFF

17.    The right of AAFES to impose finance charges in connection with use of the AAFES Credit Agreement is governed by that agreement. The rights of AAFES to impose penalties and administrative fees on delinquent AAFES credit debt are governed by 31 U.S.C. § 3717. The AAFES Credit Agreement has two deferred payment plans: (1) the Uniform Clothing Deferred Payment Plan (UC) and (2) the Deferred Payment Plan (DPP). Purchases under the UC plan are for clothing; purchases under the DPP are for other goods.

18.    Plaintiff Russell opened his AAFES credit account in 1998. At the time plaintiff Russell left the service in 2000, AAFES claims he had a DPP debt of $1,043.93 and a UC debt of $377.13.

19.    AAFES caused offsets to be made against Mr. Russell's 2005 – 2008 tax refunds

---

1   in the following amounts:  2005 Tax Refund,  $210, March 2, 2006; 2006 Tax Refund,  $318,

2   February 22, 2007; 2007 Tax Refund,  $1,952, February 7, 2008; 2008 Tax Refund, $153.78,

3   February 25, 2009.  An offset of $600 was also taken on May 15, 2008 from Mr. Russell's 2008

4   Stimulus tax refund payment.

5        20.     AAFES claims that the account was paid in full by the final offset, which was

6   taken in 2009, of $153.78.  In fact, assuming the balance claimed by AAFES in 2004 to be

7   correct,  AAFES collected at least $100 more than the amount due on the account, even

8   excluding the penalty and administrative fees.

9        21.     Through February 7, 2008, AAFES charged Mr. Russell interest on the UC

10  purchases of at least $135, all of which was improper; penalties on the DPP balance of at least

11  $403, all of which was improper; and penalties of at least $161 on the UC balance, all of which

12  was improper.

13       22.     From the time plaintiff Russell's AAFES debt became delinquent in 2000 until

14  the time AAFES claimed the account was paid in full in 2009, AAFES imposed on the account

15  and certified to TOP for collection interest on the UC debt calculated at 5% per annum, despite

16  the requirement in the AAFES Credit Agreement that no finance charge be imposed on UC debt.

17       23.     From the time plaintiff Russell's AAFES debt became delinquent in 2000 until

18  the time AAFES claimed the account was paid off in 2009, AAFES imposed on the account and

19  certified to TOP for collection a penalty calculated at 6% per annum on the UC and DPP

20  balances plus administrative charges, asserting that such amounts were due "under the provisions

21  of 31 U.S.C. § 3717."

22       24.     In February of 2008, AAFES assigned plaintiff Russell's account for collection to

23  OSI Collection Services, Inc. and added a $150 "OSI collection fee" to his debt balance.  In

24  January 2009 AAFES assigned plaintiff Russell's account to NCO Collection Services, Inc. for

25  collection and added a $42.33 "NCO collection fee" to his debt balance.  The apparent purpose

26  of adding these collection fees to the balance was to allow their collection when the debt was

27  collected by the outside collection agencies, as these collection fees were deleted from the

28  balance due when the debt was collected by administrative offset rather than by the outside

1   collection agency.

2                 **Interest Rate Calculation, Fee and Penalty Errors**

3   **UC Finance Charge Error**

4       25.    After plaintiff Russell's outstanding balance became delinquent in 2000, AAFES

5   started charging a finance charge of 5% per annum on the UC principal, in direct violation of the

6   AAFES Credit Agreement requirement that no finance charge be imposed on the UC purchases.

7   **DPP Finance Charge Errors**

8       26.    For DPP purchases, unlike UC purchases, AAFES was permitted to impose

9   finance charges based on an annual interest rate. For AAFES Credit Agreements issued for new

10   accounts starting in June of 1994, the annual interest rate was based on the prime rate plus a

11   specified additional rate. The interest rate added to the prime rate was 4.75% for more than 10

12   years, until July of 2004, after which it was between 4.75% and 5% depending on the particular

13   form of contract. The AAFES Credit Agreements provided for a minimum interest rate equal to

14   12% until June of 2000 and thereafter had either no minimum DPP interest rate, or a minimum

15   rate of 9%.

16       27.    The Russell AAFES Credit Agreement provides in paragraph 3 that the periodic

17   finance rate applicable to DPP purchases on the account shall be determined based on an annual

18   percentage rate that shall not exceed the bank prime rate in effect on each monthly statement

19   closing date plus 4.75% and shall not be lower than 12% per annum. From the time plaintiff

20   Russell's account became delinquent in 2000 until 2005, when the first administrative offset was

21   taken to collect on the account, the maximum annual interest rate allowed on his account was

22   never more than 12.25% and for most months was 12%, but during that time period AAFES

23   consistently applied an annual percentage rate in calculating the finance charge on the account in

24   excess of 12.25%.

25   **Penalty and Administrative Fee Errors**

26       28.    Paragraph 14 of the Russell AAFES Credit Agreement gave notice that "Under

27   the provisions of 31 U.S.C. § 3717, we will assess on a delinquent debt" administrative costs and

28   penalties. The purpose of 31 U.S.C. § 3717 is to allow the government to collect interest,

---

CLASS ACTION COMPLAINT       7

1  administrative costs and penalties for delinquent debt owed the government when the contract

2  itself does not deal with the interest on delinquency issue. The penalty and administrative fees

3  provision on which AAFES relies, 31 U.S.C. § 3717(a), has a restriction on its application in 31

4  U.S.C. § 3717(g). Section 3717(g) provides that the penalty and administrative fees may not be

5  imposed if the "loan agreement . . . prohibits charging interest . . . or explicitly fixes the

6  interest."

7      29.    The AAFES Credit Agreement does provide for interest and thus no

8  administrative costs or penalties "under the provisions of 31 U.S.C. 3717" may be collected.

9  After a Ninth Circuit decision in 1999 made clear that penalties and administrative fees could not

10  be collected "under the provisions of 31 U.S.C. § 3717," AAFES amended the Credit Agreement

11  for accounts opened after June of 2000 in an attempt to have the Credit Agreement itself impose

12  penalties and administrative fees and deleted the reference to 31 U.S.C. § 3717. The new

13  provisions, however, do not apply to plaintiff, whose applicable Agreement is dated before June

14  of 2000. AAFES imposed and collected from Mr. Russell penalties of more than $6.50 per

15  month and administrative costs of $15 and, after 2006, $17 for each TOP offset.

16  **Unauthorized Collection Fees**

17      30.    The form of AAFES Credit Agreement issued to new accounts before May of

18  2005, including plaintiff Russell's, had no provision relating to the payment by the debtor of fees

19  charged to AAFES by private collection agencies retained by AAFES to collect delinquent

20  AAFES debt.

21      31.    Despite the absence of any contractual or statutory right to do so, however, in

22  February 2008, AAFES added a $150 "OSI collection fee" for collection by OSI Collection

23  Services, Inc. to plaintiff Russell's account balance. In January 2009, AAFES added a $42.33

24  "NCO collection fee" for collection by NCO Collection Services, Inc. to plaintiff Russell's

25  account balance.

26  \\\

27  \\\

28  \\\

CLASS ACTION COMPLAINT                    8

# CLASS ACTION ALLEGATIONS

32.     Plaintiff brings this class action pursuant to Rule 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of two overlapping classes of persons similarly situated:  the UC Interest Class and the DPP Overcharge Class.

## The UC Finance Charge Class

33.     The claims of the UC Finance Charge Class were first asserted in *Briggs v. United States*, United States District Court for the Northern District of California, case number CV – 07 – 5760 WHA, filed on November 13, 2007.  In 2008 AAFES adjusted the debt of the plaintiff in that action to eliminate all UC finance charges and successfully move the court to declare the UC finance charge claim in that case moot.  In 2009 an application by plaintiff Russell to intervene in the *Briggs* action was denied on the ground that the time for amending the pleadings had passed and that such intervention would delay the resolution of the remaining claims of the certified class in that case.

34.     The UC Finance Charge Class, on whose behalf the First Claim is prosecuted, is defined as:  All natural persons (1) whose AAFES Credit Agreement provides that finance charges are not due on UC purchases; (2) whose delinquent UC debt has been assessed finance charges and has been subjected to collection action after November 13, 2001, and; (3) from whom the amount actually collected by AAFES exceeds the principal amount of the unpaid UCDPP purchases on the account.  The UC Finance Charge Class includes only persons whose claim does not exceed $10,000 unless such persons are willing to waive their claim above $10,000.

35.     Questions of law and fact common to the UC Finance Charge Class include:

   i.     Whether interest may be charged, pursuant to the AAFES Credit Agreement, on UC purchases, and, if not, whether AAFES improperly included amounts on account thereof in debt calculations;

   ii.    Whether AAFES has acted or refused to act on grounds generally

---

1   applicable to the UC Finance Charge Class, thereby making appropriate

2   final injunctive relief or corresponding declaratory relief with respect to

3   that Class as a whole.

4   ### The Overcharge Class

5   36.   The Overcharge Class includes persons whose AAFES debt amount was

6   improperly calculated, as alleged in the Second Claim.

7   37.   The class of persons in the Overcharge Class is defined as:  All natural persons

8   (1) from whom AAFES has collected, within the past six years, debt incurred pursuant to an

9   AAFES Credit Agreement and; (2) with respect to whom the amount claimed due exceeded or

10  exceeds the principal amount of purchases plus finance charges permitted by the AAFES Credit

11  Agreement and; (3) from whom the amount actually collected exceeds the principal amount of

12  the purchases.  The Overcharge Class does not include persons with claims that exceed $10,000

13  unless such persons waive their claim above $10,000.

14  38.   Questions of law and fact common to the Overcharge Class include:

15      i.    Whether finance charges exceeding 4.75% plus the prime rate may be

16            imposed on DPP purchases, and whether AAFES improperly included

17            such excessive finance charges in its debt due calculations;

18      ii.   Whether 31 U.S.C. § 3717 permits the imposition of penalties and

19            administrative fees on delinquent AAFES Credit Agreement accounts and,

20            if not, whether the AAFES Credit Agreement itself permits such charges;

21      iii.  Whether the private agency collection fees may be added to account

22            balances under the applicable AAFES Credit Agreement or statutory

23            authority, whether AAFES improperly included such charges in its debt

24            due calculations, and whether AAFES improperly collected such amounts;

25      iv.   Whether AAFES has acted or refused to act on grounds generally

26            applicable to the Overcharge Class, thereby making appropriate final

27            injunctive relief or corresponding declaratory relief with respect to the

28            Overcharge Class as a whole.

CLASS ACTION COMPLAINT                    10

1 \\\
2 \\\

### Numerosity and Adequacy Relating to Both Classes

3

4   39.   The Annual Reports for the Army and Air Force Exchange Service indicate that
5 the total TOP collections of AAFES debt from 2001 through 2009 will be more than
6 $500,000,000.  Information provided to plaintiff's counsel by AAFES indicates that about 3% of
7 all AAFES debt TOP offsets are for UC debt with an average offset of $391.  These figures
8 indicate that there were approximately 35,000 UC offsets during the class period starting
9 November 13, 2001.

10   40.   Information provided to plaintiff's counsel by AAFES indicates that AAFES
11 continues to use the interest rate in effect at the time an account became delinquent even when
12 the contract required interest rate would be lower.  For this reason, nearly all AAFES class
13 member accounts had interest rates imposed on them during at least part of the class period in
14 excess of the maximum allowable interest rate under the AAFES Credit Agreement.

15   41.   Plaintiff will fairly and adequately protect the interests of the classes.  Plaintiff
16 has no interests that conflict with the interests of either class, and plaintiff has engaged
17 competent counsel experienced in class actions, complex litigation involving the federal
18 government, and AAFES unfair practices.

19

### FIRST CLAIM
#### (Improper UC Finance Charges)

20

21   42.   Plaintiff incorporates herein by reference paragraphs 1 – 41.
22   43.   Plaintiff incurred debt obligations through credit extended by an AAFES Credit
23 Agreement, which governed finance charges on such debt.
24   44.   The Russell AAFES Credit Agreement (Exhibit 1) provides in paragraph 7 that
25 there is "no periodic FINANCE CHARGE assessed against" the UC purchases.  All other
26 relevant AAFES Credit Agreements had similar language.
27   45.   After plaintiff's AAFES debt was transferred to the AAFES collection
28 department, AAFES began including in the amount claimed due a finance charge (separate from

---

CLASS ACTION COMPLAINT                    11

the penalty) on the UC principal of approximately 5% per annum, when no finance charge was allowed to be charged. By the time Mr. Russell's true account balance was paid off, he had paid more than $135 in UC interest claimed due by AAFES.

46.     Plaintiff and the UC Finance Charge Class must have their AAFES debt balances due corrected and, as necessary, are entitled to restitution of any amounts illegally collected as UC finance charges.

## SECOND CLAIM
### (Correction of Credit Card Balances and Restitution of Illegally Collected Amounts)

47.     Plaintiff incorporates herein by reference paragraphs 1 – 41.

48.     Paragraph 8 of the Russell AAFES Credit Agreement in Exhibit 1 provides that finance charges will be applied to DPP purchases on the account using an annual interest rate of the prime rate on the statement closing date plus 4.75%, but not less than 12%. All members of the class have AAFES Credit Agreements that provide that the permissible DPP finance charge is between 12% and prime plus 4.75% per annum.

49.     The Russell AAFES Credit Agreement also provides in paragraph 8 that AAFES may "choose not to implement an increase in the [DPP finance charge] rate." AAFES has at various times chosen not to impose the maximum permissible rate. The maximum rate AAFES may impose in any month is the lesser of maximum allowable under the Credit Agreement or the lower rate it elected to impose during that month.

50.     The AAFES Credit Agreement in Exhibit 1 excludes unpaid finance charges and new purchases from the calculation of the daily principal balance on which finance charges are computed monthly. The Credit Agreement and applicable federal law do not allow imposition of finance charges on administrative fees, penalties or unpaid finance charges.

51.     Plaintiff and the Overcharge Class have had claims made against them by AAFES for alleged debts due which included improperly calculated and overstated DPP finance charge amounts.

52.     The AAFES Credit Agreement in Exhibit 1 provides in paragraph 14 that

1   balances more than 90 days delinquent may, "under the provisions of 31 U.S.C. § 3717," be

2   subject to penalties and administrative fees.  31 U.S.C. § 3717(g) provides that penalties and

3   administrative fees may only be imposed "under the provisions of 31 U.S.C. § 3717" if the

4   contract in question does not "explicitly fix[] the interest."  The AAFES Credit Agreement

5   "explicitly fixes the interest" thus no penalties or administrative fees may be imposed "under the

6   provisions of 31 U.S.C. § 3717."  Only with respect to government contracts that do not

7   themselves provide for interest or penalties may administrative fees and penalties be imposed

8   *"under the provisions of 31 U.S.C. § 3717."*  As the AAFES Credit Agreement is not such a

9   contract, AAFES may not collect penalties and administrative fees.

10       53.    Plaintiff and the Overcharge Class have had claims made against them by AAFES

11   for alleged debts due which improperly included penalties and administrative fees.

12       54.    The AAFES Credit Agreement Exhibit 1 had no provision relating to the payment

13   by the debtor of fees charged to AAFES by private collection agencies retained by AAFES to

14   collect delinquent AAFES debt.

15       55.    Despite the absence of any contractual or statutory right to do so, Plaintiff and the

16   Overcharge Class have had claims made against them by AAFES for alleged debts due which

17   improperly included private agency collection fees.

18       56.    Plaintiff and the Overcharge Class must have their AAFES debt balances due

19   corrected and, as necessary, are entitled to restitution of any amounts illegally collected as

20   improper interest, administrative fees, penalties or private agency collection fees..

21       **WHEREFORE**, plaintiff requests that this Court:

22       1.  Require defendant to make restitution of all improper collections from the UC

23           Interest Class;

24       2.  Require defendant to make restitution of all improper collections from the DPP

25           Overcharge Class;

26       3.  Enjoin defendant to calculate finance charges, penalties and administrative fees

27           correctly for both classes and to adjust all debtor account balances to correct for

28           calculation errors.

CLASS ACTION COMPLAINT                    13

4.  Grant any additional relief, including attorney fees, expenses, interest on the delay in payment of tax refunds and costs, and any appropriate relief under 28 U.S.C. § 2412 to which the plaintiff may be entitled.

Dated:  July 13, 2009                     Respectfully submitted,

                                          LAW OFFICES OF S. CHANDLER VISHER
                                          CONSUMER LAW OFFICE OF MARIE NOEL APPEL
                                          PUBLIC CITIZEN LITIGATION GROUP

                          By:             _____
                                          Marie Noel Appel, Esq., Attorneys for Plaintiffs

| | | | |
|---|---|---|---|
| **ANNUAL PERCENTAGE RATES** | As of _____ (today's date) _____ % for purchases _____ Customer Initials | | |
| Variable Rate Information | The ANNUAL PERCENTAGE RATE for purchases may vary each billing cycle. We will calculate the variable rate by adding 4.75 to the rate disclosed as the U.S. Prime Rate reported in the "Money Rates" section of The Wall Street Journal on the last day of each billing cycle. The ANNUAL PERCENTAGE RATE will be applied to the next billing cycle. This rate will not be lower than 12%. | | |
| Grace Period | 25 days | | |
| Minimum FINANCE CHARGE | 50 cents | | |
| Method of Computing Balances | Average Daily Balance (does not include new purchases) | | |
| Annual Fee | None | | |
| **EXCHANGE MILITARY CLOTHING DEFERRED PAYMENT PLAN (UCDPP)** | | | |
| Annual Percentage Rates | There is no interest charge added on this account. | | |
| Annual Fee | None | | |

## * * * IMPORTANT NOTICE * * *
### (Continued on Reverse Side)

THIS AGREEMENT CONTAINS THE TERMS AND CONDITIONS THAT GOVERN YOUR PARTICIPATION IN THE EXCHANGE CREDIT PROGRAM, THAT MAY BE OFFERED TO ALL ELIGIBLE CUSTOMERS OF AAFES AND PARTICIPATING SERVICE EXCHANGES. THIS AGREEMENT APPLIES TO ALL PLANS: THE BASIC RETAIL (DPP), THE MILITARY CLOTHING (UCDPP), OR ANY SPECIAL PLANS OR PROMOTIONS OF THE EXCHANGE CREDIT PROGRAM. ALL PLANS ARE GOVERNED BY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA.

SCOPE OF AGREEMENT. This Agreement governs the terms and conditions of your participation in the EXCHANGE CREDIT PROGRAM. The words "you" and "your" refer to any person who signs an application for an account under the EXCHANGE CREDIT PROGRAM as described in this document. "We," "us," and "our" refer to the Army and Air Force Exchange Service (AAFES), which offers the EXCHANGE CREDIT PROGRAM and any person to whom this Agreement may be assigned. Unless otherwise specified, when used in this Agreement, "Account" means your EXCHANGE DPP/UCDPP account.

ACCEPTING THE AGREEMENT. Upon AAFES account approval, you agree to be bound by these terms and conditions for any purchase made by you or anyone you authorize, (apparent or implied), to use your account.

CREDIT LIMITS, MONTHLY PAYMENTS AND MERCHANDISE RETURNS. We will establish DPP credit limits based on your disposable income and credit history and will also establish UCDPP credit limits for eligible military members. Your purchases under these plans may not exceed these limits. Your credit limits will be shown on your monthly statement. Changes to your credit limit will be based on your account history. We may periodically offer special promotions in the Exchange Credit Program. These promotions may require purchases of special products or dollar amounts. Unless superceded by a special promotion or offer specifically relating to annual percentage rate, grace period, finance charge, or payment due date, these terms and conditions will apply to any such promotion.

IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR BILL. The Federal Truth in Lending Act requires prompt correction of billing errors. If you think your bill is wrong or you need more information about an item on your bill, write on a separate sheet of paper to our address shown on your bill. We must receive your inquiry within 60 days after we sent you the bill on which the problem appeared. You may call us, but doing so will not preserve your rights. In your letter, give us:

Your name and account number;
The amount of the suspected error;
A description of the error and why you believe it is an error.

Describe any item you are unsure about. You don't have to pay amounts in question while we are investigating, but you are obligated to pay the parts of your bill that aren't in question. While we investigate, we cannot report the amount in question as delinquent to any credit agency nor can we take any action to collect that amount. If you have authorized us to pay your bill by an automatic electronic debit from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur. For purposes of this section, "business day" will mean everyday other than a Saturday, Sunday or a Federal Bank holiday.

SPECIAL RULES FOR DPP CREDIT CARD PURCHASE. If you have a problem with the quality of property or services that you purchased on account, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or service. There are two limitations on this right:

You must have made the purchase in your home state or, if not within your home state, within 100 miles of your current mailing address; and

the purchase price must have been more than $50.

These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.

6. FINANCE CHARGE COMPUTATION. If you pay the revolving balance shown on this bill by the due date, there will be no additional FINANCE CHARGE. If you choose to extend payments, a FINANCE CHARGE will be computed as follows:

a. We start with the previous revolving balance less unpaid FINANCE CHARGES.

b. Each day we subtract credits posted to your account. We do not add new purchases in this computation. This gives us your daily balances.

c. We sum the balances and divide that sum by the number of days in the billing cycle to determine your average daily balance.

d. The average daily balance is multiplied by the periodic rate for that monthly billing cycle.

7. NO FINANCE CHARGE ON UCDPP. There is no periodic FINANCE CHARGE assessed against the EXCHANGE UCDPP or the AAFES UCDPP.

8. PERIODIC RATE AND ANNUAL PERCENTAGE RATE FOR EXCHANGE DPP. Your account has a variable interest rate and the ANNUAL PERCENTAGE RATE (corresponding to the periodic rate) may change as a result. If the rate increases, there will be a corresponding increase in your minimum payment and in the FINANCE CHARGES. For each monthly billing period, the ANNUAL PERCENTAGE RATE will be the "Account Prime Rate" in effect for that billing period plus four and seventy-five hundredths (4.75%) percentage points. The "Account Prime Rate" will be the rate published and announced as the "Prime Rate" in the "Money Rates" section of The Wall Street Journal ("the Journal") on the Closing Date of your billing cycle. The Closing Date of your billing cycle is shown on your billing statement. If your Closing Date is not a business day, the "Account Prime Rate" will be the rate published as the "Prime Rate" in the Journal on the preceding business day. After we compute the applicable rate, it will be applied to your Account on the first day of your next billing period, if there was no previous DPP balance or in a monthly billing period during which payment and/or credits equal or exceed the previous balance. Otherwise, it will be applied from the date of purchase. The periodic rate shall not be less than a periodic rate with a corresponding ANNUAL PERCENTAGE RATE of 12.00%. The effect of the variable interest rate is that your minimum payment will increase or decrease based on increases or decreases in the ANNUAL PERCENTAGE RATE. For purposes of this section, "business day" shall mean every day other than a Saturday, Sunday or a Federal Bank holiday. If we choose not to implement an increase in the rate, you agree and understand that this shall not affect our right to implement increases at a later date, and shall not constitute a waiver, an amendment or change in terms of the Agreement. We reserve the right to temporarily offer an annual percentage rate lower than the Prime Rate plus 4.75%.

9. GRACE PERIOD--NO FINANCE CHARGE IS ASSESSED. No FINANCE CHARGE is assessed in a monthly billing period during which there was no previous DPP balance or in a monthly billing period during which payments and/or credits equal or exceed the previous balance. You may pay your entire balance at any time without incurring additional FINANCE CHARGES.

10. MINIMUM CHARGE. If the amount of the FINANCE CHARGE due for any billing period is less than fifty cents ($.50), a minimum FINANCE CHARGE of fifty cents ($.50) will be charged for the billing period.

11. FEES. We may charge a $15 fee for your account if you have exceeded your account limit at the time the billing statement is generated. We may charge a $5 fee for each statement and/or charge ticket you request. We may charge a $25 fee for special credit reporting performed at your request.

12. MONTHLY BILLING. We will send you a monthly statement for each billing cycle in which there is account activity or your balance owed is greater than $1.00. The statement will show your beginning balance, detail transactions for the billing cycle, FINANCE CHARGES, if any, and the new account balance(s). The statement will also show the payments due for each active payment plan, the total payment due for the billing period and the payment due date. Your monthly payments on each of your plan(s) and your total monthly payment due are determined as follows:

a. When you make a purchase under the Exchange DPP, your monthly payment is determined based on a 36-month payback period, including new purchases and interest. Each month, you will be required to pay at least the minimum payment, as reflected in your monthly billing statement. When your balance is less than $10, you must pay us your total balance.

b. When you make a UCDPP purchase your monthly payment is determined based on an 8-month payback period, including new purchases. Each month, you are required to pay the minimum payment on your monthly billing statement.

c. The sum of the monthly payments for all active credit plans is the total payment due for the billing period. This total, shown on your statement as "Payment Due" and is the minimum amount due for that billing period. You may at any time pay your entire balance in full, or more than the minimum

Exhibit 1

nority and sequence: first to the minimum payments due on ICDPP/DPP/Special Plan accounts which includes over due amounts. Any additional amounts will be allocated to each plan based on its percentage of the total account balance.

. The following charges may be assessed as a purchase in the month in which a payment check is returned as dishonored for any reason, including stop payment: the value of the returned payment check, plus an administrative fee, plus bank fees. The administrative fee and bank charges will still be assessed if the check is later paid upon subsequent presentment. We may also charge an administrative fee if any automatic debit fails to be paid.

3. IRREGULAR PAYMENTS. We will accept and post payments marked as "PAYMENT IN FULL" or with similar words; however, acceptance of checks or money orders with such words does not constitute acknowledgment by us that the account is paid in full.

4. ASSESSMENT ON DELINQUENT BALANCES. Under the provisions of 11 U.S.C. 3717, we will assess on a delinquent debt, in addition to interest accruals on the outstanding balance: (1) an administrative fee to cover the cost of processing, handling, and collecting a delinquent claim; and (2) a penalty charge of 6 percent annually for failure to pay any part of this amount more than 90 days past due.

5. LATE PAYMENTS. If we do not receive your payment by the due date, your account will be considered overdue. If your account becomes delinquent, you consent to the maximum deduction allowable from military or retired pay under the authority of DoDPM Chapter 7, or from your civilian pay under the provisions of 5 U.S.C. 5514 or any provision of the Debt Collection Act.

16. SUSPENSION OF EXCHANGE CREDIT PROGRAM PRIVILEGES. If payment is not made within 30 days after the due date, your account will be considered delinquent, and charge and check presentation privileges may be withdrawn. Your unit commander, work supervisor, or other entity in DoD may be notified to assist in collection. If payment is not made within 30 days after the due date, the current delinquent amount due for the first two instances of unresolved delinquencies will be submitted for collection. A third unresolved delinquency will result in the submission of the entire account balance for collection. In the event your privilege to write a personal check for merchandise or cash is suspended for reasons other than account delinquency, charge privileges will also be suspended, even if your account is not in a delinquent status.

17. VOLUNTARY REPAYMENT. At any time your account is delinquent, AAFES can work with you to establish voluntary repayment of account balances.

18. CONTINUING OBLIGATION BEYOND EXPECTED TIME OF SEPARATION (ETS/EAS). You may not make purchases on the Exchange DPP after your ETS/EAS date. If your ETS/EAS date changes, notify us. If you no longer have exchange privileges, you may pay off the obligation over the normal time period.

19. ELIGIBILITY FOR DPP AFTER ACTIVE DUTY. Those individuals who separate from active duty military status and maintain exchange privileges are eligible to continue in the Exchange Credit Program.

20 PENDING SEPARATION. (a) Under other than normal conditions, we may request DoD entities, or other organizations for civilian personnel, to withhold from your pay for payment to us, an amount equal to the balances owed under this Agreement if we are notified of your pending separation from military/civilian service under other than normal conditions. (b) If you are an Exchange employee separating under normal conditions and your account is delinquent, your final pay may be offset in an amount required to satisfy the entire balances owed. Exchange employees separating under such conditions waive procedures for administrative offset under 31 USC 3711 and 31 USC 3716..

21. DISCLOSURE TO CREDIT AGENCY. We may disclose your account activity to a consumer reporting agency and under 31 U.S.C. 3711(f), we may disclose your indebtedness to such agency should it become delinquent. If you believe there is an error in the reported account activity, you must provide us written notice. Include your name, address, social security number, telephone number, account number, type of account, specific item of dispute, reason why you believe the information reported is in error, and supporting documentation. Send your notice to the address listed under the NOTICES (paragraph 32) in these terms and conditions.

22. TREASURY OFFSET PROGRAM. Under the provisions of the Debt Collection Improvement Act of 1996, P.L. 104-134, your delinquent debt may be submitted to the Department of the Treasury for offset against a federal payment due you, including federal income tax refund.

23. SECURITY INTEREST. To the extent permitted by law, we retain a security interest in all merchandise charged to your Account under the EXCHANGE DPP. You grant AAFES a purchase money security interest under the Uniform Commercial Code (UCC) in the merchandise purchased under this Agreement in order that AAFES may retake possession of the merchandise if you do not make payments when due.

AAFES FORM 6450-26 (Rev Oct 98) Previous Editions Obsolete
Item No. 752645026

party under the UCC. These remedies include the right to retake possession of the merchandise if you are in default under this Agreement. Upon any default, you will, at AAFES' request, take the merchandise to the nearest Exchange. You will be in default if you sell or otherwise dispose of the merchandise without AAFES' written consent.

25. FAMILY MEMBER AUTHORIZATION. The account holder may authorize family members 18 years of age or older to use the account(s) by identifying them in the application. Withdrawal of family member authorization must be requested by the account holder in writing. A written request is also required when the account holder rescinds a General Power of Attorney previously provided to a family member. A Special Power of Attorney is required for opening or closing an account, adding an authorized card holder, unblocking an account, or requesting a credit limit increase.

26. LIABILITY OF CARDHOLDER FOR UNAUTHORIZED USE. Unauthorized use means the use of a DPP account by a person, other that the cardholder, who does not have actual, implied, or apparent authority for such use, and from which the cardholder received no benefit. The liability of a cardholder for unauthorized use shall not exceed the lesser of $50 or the amount of money, property, labor, or services obtained by the unauthorized use before notification to the card issuer.

27. NOTIFICATION OF LOST OR STOLEN CARD. You agree to notify us as soon as practicable if your DPP card is lost or stolen. Notification may be made by calling our toll-free number, in writing, or in person at the Customer Service area of a main exchange. You agree to provide us with pertinent information about the loss, theft, or possible unauthorized use.

28. ASSIGNMENT OF ACCOUNT. We may sell or assign all or any part of your Account to another creditor without further notice to you. If we do, the notice below, which is required by federal law, is intended to protect any claim or right you have against us.

NOTICE. ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH YOU THE DEBTOR COULD ASSERT AGAINST US THE SELLER OF THE GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

29. CANCELLATION. We may cancel this Agreement as it relates to future purchases at any time.

30. CHANGING THESE TERMS AND CONDITIONS. To the fullest extent permitted by applicable law, we reserve the right to change any term or part of this Agreement (including the amount and method of calculating the FINANCE CHARGE) at any time. Except for changes in the variable interest rate, we will provide you notification of any changes at least 30 days before the effective date of the change. Any change in terms will apply to your account on the effective date of the change and will apply to transactions made on or after the effective date, as well as to any outstanding balance(s). If the change has the effect of increasing your FINANCE CHARGE, the periodic interest rate or other fees or charges, the change will not apply if: (1) You notify us in writing within the period of notification specified in the change that you do not agree to accept such change; and (2) You do not use your account for purchases on or after the effective date specified in the notice of change. Use of the account for purchases on or after the date of the change will constitute your acceptance of the terms specified in the change.

31. CHANGE OF ADDRESS. If you move, you must give us written notice of your new address. Otherwise, we may suspend account charging privileges and any notice sent by us to you at your address of record shall be effective notice. Failure to notify us of an address change does not constitute permission to disregard any payment obligation.

32. NOTICES. Unless otherwise required by law or the credit documents creating your account, all notices to you may be hand delivered or mailed to you at your address of record which is your address on your application for the Account, unless written notification of change has been received, and shall be deemed given when hand delivered or deposited in the mail. Notices to us will not be deemed given until received in writing at our offices at the following address:

Army and Air Force Exchange Service (AAFES)
P.O. Box 660524
Dallas, TX 75265-0524

DPP Service Telephone Numbers
CONUS (Includes Alaska & Hawaii) 1-800-826-1317

| | |
|---|---|
| GERMANY 0130-81-2469 (Toll-free) | NORWAY 214-312-6030 Collect |
| ITALY 1678-72683 (Toll-free) | CRETE 214-312-6030 Collect |
| UNITED KINGDOM 0800-96-1843 (Toll-free) | NETHERLANDS 214-312-6030 Collect |
| BELGIUM 0800-1-6374 (Toll-free) | OKINAWA (Toll-free) 0031-114239 |
| TURKEY 214-312-6030 Collect | KOREA (Toll-free) 00308-130663 |
| SAUDI 214-312-6030 Collect | JAPAN (Toll-free) 0031-114239 |
| SPAIN 214-312-6030 Collect | PANAMA (Toll-free) 001-800-846-7195 |

AAFES -- Briggs

Exhibit 1