IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

TAYLOR RUSSELL, on behalf of himself
and all others similarly situated,

    Plaintiff,

  v.

UNITED STATES OF AMERICA,

    Defendant.

No. C 09-03239 WHA

**ORDER CERTIFYING CLASS AND APPOINTING CLASS COUNSEL**

## INTRODUCTION

In this putative class action involving military credit cards, plaintiff renews on remand its motion for class certification. For the reasons stated below, the motion is **GRANTED IN PART**.

## STATEMENT

**1.  PROCEDURAL HISTORY.**

The procedural background of this action has been described in prior orders (Dkt. Nos. 105, 152). In July 2009, plaintiff Taylor Russell sought to sue the United States on behalf of soldiers and veterans who used credit cards issued by the Army and Air Force Exchange Service. By June 2010, his class claims were dismissed as moot because he had received a full refund for his individual claim before moving for class certification. That order found that Russell's refund came as part of a voluntary audit of thousands of accounts, "outside the aegis of this lawsuit [and that] this scenario does not invoke the policy concerns of a defendant targeting only the named

plaintiffs to prevent a suit and frustrate the objective of a class action." Russell appealed the dismissal of one class claim — AAFES overcharged on deferred payment plan (DDP) debt — but did not appeal the dismissal of other class claims relating to uniform clothing (UC) purchases and certain administrative fees and penalties. *See Russell v. United States*, No. C 09-03239, 2009 WL 4050938, at *3 (N.D. Cal. Nov. 23, 2009).

The Federal Circuit affirmed that Russell's individual claim had been fully satisfied by a refund of $150 despite purported claims for attorney fees and costs. *Russell v. United States*, 661 F.3d 1371, 1374–75 (Fed. Cir. 2011). However, based on the appellate court's interpretation of an intervening Ninth Circuit decision in *Pitts*, the Federal Circuit disagreed that mooting Russell's individual claim warranted dismissing his DDP class claim as moot. *Id.* at 1376–78. The Federal Circuit ordered the following remand instructions:

> In light of the Ninth Circuit's intervening decision in Pitts and in light of the post-dismissal adjustment of the 103,320 additional [] accounts, resulting in an additional 69,198 refunds, we conclude that the dismissal order should be remanded to the district court for further consideration. The further audit and the additional refunds raise the question whether and to what extent the *entire prospective class* that Mr. Russell seeks to represent has now been granted the relief, through voluntary action by the government, that his lawsuit was designed to obtain. *Further development of these facts will no doubt help determine if the case, even if not moot at the time of the district court's original dismissal order, is now moot*.

*id.* at 1377–78 (emphasis added). This Court then ordered further factual development as to whether the DPP class claim had been mooted by the AAFES's voluntary account adjustments and refunds (Dkt. No. 152). Based on the evidence uncovered from supplemental discovery, this order finds that the DDP class claims are not moot, as discussed below.

**2. FACTUAL HISTORY.**

**A. Events Giving Rise to this Action.**

In 1997, Mr. Russell opened a credit account with the AAFES for a credit card to use on military bases. His credit-card agreement provided for a variable interest rate of 4.75% plus the monthly bank prime rate, with a minimum rate of 12% (Compl. Exh. 1). In 2000, Mr. Russell

2

1  became delinquent on the balance and incurred interest charges. From 2000 until 2005, AAFES
2  applied an annual percentage rate on his account of 14.25% even though the allegedly maximum
3  annual interest rate allowed pursuant to his credit-card agreement was never more than 12.25%
4  and for most months was 12% (Dkt. 140 at ¶ 26). He also incurred finance charges associated
5  with that delinquent balance.

6　　　　In July 2009, Mr. Russell filed this action alleging that he and others were overcharged
7  by the AAFES. AAFES's credit-card agreements have undergone various modifications over the
8  years (Dkt. No. 74 Exhs. 1–4; *see also* Dkt. No. 160 Exhs. 1–3). Between 1992 and now, the
9  AAFES has modified their standardized agreements at least twenty times (Dkt. No. 97 at ¶ 22).
10 These modifications have included changes to the variable interest rates (*see also* Dkt. No. 140
11 at ¶ 14):

12　　　a.　　In September 1994, the annual rate was determined by prime plus 4.75% with a
13　　　　　　12% minimum.
14　　　b.　　From July 2004 until April 2005, the annual rate was determined by prime plus
15　　　　　　5.0% with a 9% minimum.
16　　　c.　　From May 2005 until August 2006, the annual rate was determined by prime plus
17　　　　　　4.99% with a 9% minimum.
18　　　d.　　From September 2006 until March 2007, the annual rate was determined by prime
19　　　　　　plus 4.99% with a 9.99% minimum.

20 The record contains four versions of the credit-card agreements. Importantly, all versions had
21 contractual provisions that calculated the cardholder's interest rate in a similar manner based on
22 the prime interest rate listed in the Wall Street Journal (Visher Decl. ¶¶ 11, 12). All contracts
23 contained substantially identical provisions regarding calculation of DPP interest charges (*see*
24 Dkt. No. 74 Exhs. 1–4):

> **Retail Plan Cost of Credit**: . . . . If we do not receive the full amount due (the 'New Balance' shown on your statement) within 25 days after the Closing Date shown on your statement, we will impose a Finance Charge by applying a monthly periodic rate ('periodic rate') to the Average Daily Balance (as explained in paragraph 7). *Your periodic rate and the corresponding Annual*

3

> *Percentage Rate will vary.* The periodic rate applied in any billing period will be equal to 1/12th of the total of: (i) the highest bank prime loan rate as published in the The Wall Street Journal in its 'Money Rates' section ('prime rate') on the Closing Date of your previous billing cycle shown on your statement (if your closing Date is not a business day, the prime rate will be the rate published in the Journal on the preceding day that is a business day), (ii) and [your interest rate]. If the prime rate increases, the periodic rate and corresponding Annual Percentage Rate may increase, and as a result the Finance Charge and required minimum monthly payment may also increase, however, we reserve the right to not increase the rate when prime increases. Prime rate increases are effective on the next billing cycle after the rate increase and will apply to the entire account balance, including purchases. Any new periodic rate will apply to the entire balance in the Account without further advance notice to you.

(Dkt. No. 74 Exh. 4 (October 2006 agreement)) (emphasis added). The AAFES allegedly violated these agreements through a common practice of calculating interest charges on delinquent accounts on a *fixed rate* basis using the prime rate at the *time the account became delinquent*, instead of periodic adjusting the interest rate (Dkt. No. 140 ¶ 15).

### B. Account Adjustments and Refunds.

After this action was filed in 2009, AAFES voluntarily corrected delinquent accounts and issued refund checks (Dkt. No. 160 at ¶ 4). The account adjustments took the following steps (Dkt. No. 160 at ¶ 10):

> (1) calculate the interest adjustment using the applicable minimum rate retroactively based on the principal balance; (2) apply any overpayment of interest to principal; (3) calculate penalty adjustment based on new principal balance; (4) apply any overpaid penalty to principal; (5) reverse all interest and penalty accruals once the total balance equals zero; (6) offset for standard administrative write-offs where an account balance up to $25 had been deemed not collectible; (7) extract accounts with unusual issues for further review; (8) apply a credit balance to other types of debt owed the Exchange; and (9) issue a refund whenever the result of these steps leaves a credit balance in the customer's account.

4

1  For simplicity, the refund amounts were calculated using the minimum rate under the contracts
2  instead of adjusting for variable monthly rates *(id.* ¶ 8). It is unclear whether refunds included
3  administrative charges of $17 where appropriate and interest on tax offsets (Dkt. No. 156 at ¶¶
4  55–63).

5  By May 2010, AAFES had adjusted 149,781 accounts and issued 101,351 refund checks
6  (Dkt. No. 97 at ¶ 19). In various filings, the AAFES has also reported the number of refund
7  checks issued to be 104,371 (Dkt. No. 154 at ¶ 21). This discrepancy is purportedly due to
8  different individuals conducting the database search (Dkt. No. 156 at ¶ 47). In March 2012, the
9  AAFES discovered 35 individuals that should have received refunds but were inadvertently
10 excluded (Dkt. No. 154 at ¶ 33).

### C. Status of Refunds Issued.

As discussed, between November 2009 and May 2010, the AAFES sent the approximately 100,000 refund checks to the customers' last-known addresses in its collections database (Dkt. No. 160 at ¶ 20). Of these, approximately 21,000 checks were returned as undeliverable and another 40,000 checks remain uncashed *(id.* at ¶¶ 28–29). That is, approximately *sixty percent* of persons the AAFES determined were owed refunds have not been paid. This amounts to approximately *two million* of the five million dollars in total refunds the AAFES determined was due (Dkt. No. 156 ¶¶ 23, 25). Three-quarters of these unpaid members are owed less than 25 dollars. Approximate 4,000 are owed $100 or more *(id.* ¶ 33).[1]

### D. Follow-up Efforts on Uncashed and Undelivered Refund Checks.

It has been two years since the initial mailing of the refund checks; the AAFES has not tried to resend the 60,557 refund checks that were uncashed or returned. Only a couple of weeks ago did the AAFES requested updated mailing addresses from the IRS on these accounts (Dkt. No. 154 at ¶¶ 27–28). This was done only after an order denied the AAFES's motion to dismiss

---

[1] There were also "Exception Accounts" that were adjusted later (after May 2010) due to individualized issues that posed complications (Dkt. No. 160 at ¶¶ 11–20). Approximately 3,000 of these accounts were issued refund checks in early 2012. Russell argues that this delay in issuing refund checks shows bad intent on the part of the AAFES. The government argues that it was working diligently and incurred significant expenses reviewing these "Exception Accounts" (approximately $350,000).

5

1 on remand. Even though the AAFES has not resent refunds checks, it will honor a refund if the
2 customer calls in and makes a request *(id.* at ¶ 22).

### E. Proposed Class Definition.

Now, Russell seeks to certify a class pursuant to Rules 23(b)(2) and (b)(3) on behalf of persons who were subject to overcharges and did not cash or receive a refund check. The proposed class is (Br. 12):

> All natural persons (1) from whom AAFES has collected, after July 16, 2003 and through the present date, debt incurred pursuant to an AAFES Credit Agreement; (2) from whom the amount collected exceeded the principal amount of account purchases in all categories plus finance charges permitted by the applicable AAFES Credit Agreement and allowable penalties and administrative fees and; (3) were not sent or have not cashed refund check(s) for the full amount of the interest overcharge(s). The class does not include persons with claims that exceed $10,000 unless such persons waive their claim above $10,000.

Russell further explains in a footnote that this definition does not include "persons who still have outstanding debt as calculated using plaintiff's theory of interest calculation." Russell also explains that the proposed class is limited to persons "who have not been issued a refund check by AAFES or have not cashed such check" (Br. 12 n.4).

In his reply brief, Russell seemingly modifies the proposed class definition by stating that the class includes "only persons *AAFES determined were due a refund*" (Reply 3) (emphasis added). Moreover, persons who have cashed their refunds from AAFES already are "not in the proposed class" because, counsel argues, they "got the benefit of this class action" (Reply 3). That is, Russell seeks only to include persons who the AAFES has already determined were due refunds during its voluntary adjustments but who have not cashed or received AAFES's refund checks. According to the AAFES's own records, this class definition would include 60,557 members (Dkt. No. 154 at ¶¶ 28–29).

6

**ANALYSIS**

**1.    RUSSELL'S UNIFORM CLOTHING CLAIM REMAINS DISMISSED.**

As an initial matter, this order must address Russell's request to revive his UC class claim, which was dismissed in 2009 and not challenged on appeal. When a party could have raised an issue in a prior appeal but did not, a court later hearing the same case need not consider the matter. *United States v. Nagra*, 147 F.3d 875, 882 (9th Cir. 1998); *see Securities Investor Protection Corp. v. Vigman*, 74 F.3d 932, 937 (9th Cir. 1996).

> When a case has been once decided by this court on appeal, and remanded to the [district court], whatever was before this court, and disposed of by its decree, is considered as finally settled. The [district court] is bound by the decree as the law of the case, and must carry it into execution according to the mandate. That court cannot vary it, or examine it for any other purpose than execution; or give any other or further relief; or review it, even for apparent error, upon any matter decided on appeal; or intermeddle with it, further than to settle so much as has been remanded. . . . . But the [district court] may consider and decide any matters left open by the mandate of this court. . . .

*United States v. Thrasher*, 483 F.3d 977, 981 (9th Cir. 2007) (brackets in original).

Russell's UC claim was dismissed in a separate order from the order dismissing his DPP claim (Dkt. No. 29). Final judgment on both his UC and DPP claims was entered. On appeal, Russell did not argue the merits of the UC claim dismissal. Indeed, the appellate opinion expressly noted that Russell's "UC[] claim was dismissed as moot in November 2009. [But] Mr. Russell does not challenge that dismissal on appeal." *Russell v. United States*, 661 F.3d 1371, 1373 n.1 (Fed. Cir. 2011). The Federal Circuit stated that it was upholding "the district court's rulings in several respects" but remanding as to the mootness of the *DPP accounts*. 661 F.3d at 1378. There is only speculation as to how many of UC claims remain unpaid. The undersigned is exercising his discretion to not go beyond the scope of the remand instructions, and therefore, Russell's request to revive his UC claims is denied.

**2.    RUSSELL'S DPP CLASS CLAIM IS NOT MOOT.**

Contrary to the government, Russell's putative class claim for DPP accounts is not moot. The Federal Circuit, on appeal, expressly held that "partial payment" to putative class members

7

1 would not render an action moot because it does not "satisfy the demands of the class." *Russell*,
2 661 F.3d at 1377–78. This is the law of the case. The undisputed facts show that Russell's
3 putative class has only received partial payment. It is undisputed that more than half of the
4 complaint's putative class members have not cashed or received refunds.

5 Analogously, the government argues that persons to whom the AAFES has sent refund
6 checks cannot be class members even if they have not received or cashed theirs checks. The
7 government cites no authority on point for its argument. This order holds, on the facts of this
8 action, that a refund returned as undeliverable or uncashed after one mailing attempt to the last
9 known address in a collections database does not moot the class member's claim. *First*, the
10 refunds returned as undeliverable did not reach the class members. By analogy, our court of
11 appeals has held, in an unpublished decision, that a notice of forfeiture returned as undeliverable
12 mail provided insufficient due process because no further efforts to deliver the notice were made.
13 *Cf Collette v. United States*, 247 Fed. Appx. 87, 88, 2007 WL 2565940 at *1 (9th Cir. 2007).
14 *Second*, it is likely that uncashed refunds either did not reach the class members or the
15 information accompanying the refund checks did not adequately explain that the check was
16 meant to compensate for a miscalculation of their credit account (AAFES has not described what
17 information accompanied the refund checks). The government is correct that rejected payments
18 will still moot a claim. *Russell*, 661 F.3d at 1374–75. But here, there is no evidence that any of
19 the uncashed refund checks were received by class members nor any evidence that class member
20 rejected the refund checks. Therefore, on this record, Russell's DPP class claims are not moot.

21 **3. RULE 23(a) REQUIREMENTS.**

22 Pursuant to Rule 23(a), for a named plaintiff to obtain class certification, the court must
23 find: (1) numerosity of the class; (2) there are common questions of law or fact; (3) that the
24 named plaintiff's claims and defenses are typical; and (4) that the representative parties can
25 fairly and adequately protect the interests of the class. "In addition to the explicit requirements
26 of Rule 23, an implied prerequisite to class certification is that the class must be sufficiently
27 definite; the party seeking certification must demonstrate that an identifiable and ascertainable

class exists." *Xavier v. Philip Morris USA Inc.*, No. C 3:10-cv-02067 (N.D. Cal. April 18, 2011) (Alsup, J.).

### A. Ascertainable.

As stated, Russell's proposed class definition foregoes an independent recalculation to determine appropriate refunds, if any, of all 149,781 delinquent accounts, and instead adopts the AAFES's finding of 60,557 accounts that are owed refunds but where refund checks are still uncashed or were returned as undeliverable. Russell admits that persons who have already had their accounts adjusted by AAFES and cashed refund checks are not part of his class definition (Reply 3). This order agrees and finds that the AAFES's methodology of account adjustment and determination of refunds appears correct (*see* Dkt. No. 154 at ¶ 24). This determination was based on objective criteria such as interest rates and debt amount that can be ascertained in a reliable manner, not on subjective feelings and beliefs. In addition, the costs of recalculating all 149,781 delinquent accounts would be greater than any potential benefit for members who have already cashed refunds and had their accounts adjusted. Therefore, the certified class will be limited to the already-ascertained 60,557 persons for whom the AAFES determined were due refunds but who have not yet cashed or received refund checks.

The government argues that Russell's proposed class is indefinite because it references only "finance charges" and does not specify "UC" or "DPP" finance charges. This order agrees and will correct this vagueness in its class definition. For the DPP accounts, the AAFES has already provided an extensive list of adjusted accounts identified by customer identifications (Dkt. No. 157). The government's other arguments will be addressed below.

### B. Numerosity.

The class includes 60,557 members nationwide. This order finds the class to be so numerous that joinder is impracticable.

### C. Commonality and Typicality.

> The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the

9

> interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest.

*Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 n.5 (2011). The class members' "claims must depend upon a common contention. . . . That common contention, moreover, must be of such a nature that it is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 2551.

The common issue is whether AAFES breached standardized credit agreements through its common practice of using a fixed interest rate rather than the variable rate specified in the contracts. The common question is whether AAFES's assessed finance charges exceeded the rate specified by the credit agreement plus prime rate. The common determinations are interpreting substantially identical contractual provisions on how finance charges are calculated using variable interest rates (or fixed minimum) and whether AAFES violated those agreements by using a fixed interest rate based on the date that the accounts became delinquent. Importantly, all of the class members' contracts were substantially identical in the relevant provisions, the only variation being the agreement's interest rates. All provisions on calculation of finance charges had the same language. All class members were subject to AAFES's common practice of collecting finance charges using a Treasury offset of tax returns.

It is true that there are individual issues as well. These issues relate to factual matters such as the date of the agreement, the date of collection, the particular credit agreement used by AAFES on those dates (but all with substantially identical provisions on calculation finance charges), the delinquent debt amount, the interest rate AAFES used to calculate finance charges on the account, and the amount of the delinquent debt collected. While determining whether there was a breach of contract may require resolution of these individual issues, these individual issues do not break commonality on the predominate issue of whether the AAFES's practice of using a fixed interest rate was a violation of substantially identical provisions on finance charges

10

1    for all the contracts. Moreover, many of these individual issues can be resolved through
2    computer algorithms and do not pose difficult legal or factual questions. Indeed, most of the
3    calculations and data have already been provided by the AAFES through its voluntary refund
4    process (*see* Dkt. No. 157). To sum up, this order finds that mechanisms can be devised for
5    addressing any disputes which may arise regarding individual-account facts and that the potential
6    for such disputes is not an insuperable obstacle to class certification.

###         D.    Adequacy.

8    The government contends that Russell and his counsel do not qualify as adequate
9    representatives of the putative class. *First*, the government argues that Russell and his counsel
10   are seeking to disrupt a voluntary refund process that costs customers nothing and replace that
11   with one that will require costs for class administration and attorney's fees. This argument is
12   rejected. If the government had wanted to make this argument, it should have done a far better
13   and more complete voluntary effort. This recent supplemental discovery on remand has shown
14   that the AAFES's "voluntary refund process" has failed to deliver refunds to 60,557 class
15   members (Dkt. No. 154 at ¶¶ 28–29). These members are not better off with the AAFES's
16   voluntary refund effort because (1) they have not been compensated and (2) the AAFES has no
17   precise plan to resend refund checks. Instead, the class mechanism is necessary to employ
18   similar safeguards for refund delivery as those the Court used in *Briggs v. United States*, No.
19   07-5760 WHA (N.D. Cal.) (Alsup, J.), a companion case against the AAFES where the
20   percentage of refunds delivered and cashed was much higher. In *Briggs*, only fourteen percent
21   (910 of 6,592) of the veterans eligible to receive refunds did not cash their check. This was
22   likely due to the extended effort employed to locate class members. The class address list was
23   updated through the National Change of Address database, which contains change of address
24   information submitted to the post office. Commercial databases were used to locate new
25   addresses for class members whose letters came back undeliverable. Letters were written to
26   addresses where the check was sent but not cashed. And a private investigator was hired to
27   locate class members when it was economically efficient to do so (Dkt. No. 156 at ¶¶ 27–32).
28

1  These efforts produced good results. None of these things have been done for the 60,557
2  members Russell now seeks to certify as a class.

3  The government also argues that Russell is inadequate because he has no personal stake
4  remaining in the litigation. This argument is rejected. As discussed above, a putative class
5  action is not moot because the named plaintiff's individual claim is moot. The government's
6  inadequacy argument against Russell is an inappropriate end-run around the Federal Circuit's
7  mootness holding.

8  Finally, the government argues that plaintiff's counsel, Attorney S. Chandler Visher, is
9  inadequate due to his lack of candor with the Court in two instances. *First*, the government
10  points to Attorney Visher's *untrue* sworn declaration. In *two* attempts to certify a class in this
11  district, Attorney Visher represented that "[he] believe[d] that no other actions have been filed
12  against AAFES which involve the same issues as presented in this case" (Dkt. No. 140 (Visher
13  Decl.) ¶ 28; *see also* Br. 17). This was false. Attorney Visher himself filed a *duplicate action* in
14  the Southern District of Ohio with the same claims against AAFES pending on behalf of a
15  similar putative class in 2010. *Franks v. United States*, No. 10-584 (S.D. Ohio June 24, 2010).
16  A few months ago, the Ohio action was stayed pending the outcome of this instant action.
17  Attorney Visher explains that his mistake was inadvertent.

18  *Second*, the government points to Attorney Visher's prior conduct in this action two years
19  ago regarding a proposed intervener, Charles Davidson, as substitute for lead plaintiff Taylor
20  Russell after an order held that Mr. Russell's individual claim was moot. The order denying the
21  intervention found that Attorney Visher "manipulated" Mr. Davidson by advising him to opt out
22  of the *Briggs* settlement and forego his 100% refund of $350 in *Briggs* to improve his chances of
23  successfully intervening in the instant case where his claim was only for $45. The order found
24  Attorney Visher's manipulation "troubling:"

> 25  Attorney Visher apparently told Mr. Davidson that
> 'thousands of veterans overcharged by AAFES
> 26  would have no remedy' if the instant case remained
> without a class representative.
> 27
>      *     *     *
> 28  [T]his is *not true*. Any veteran who believes he or
> she has not received full relief *on the merits* is free

12

> to assert his or her rights in court, by either intervening in the instant case or by filing a new lawsuit, with or without Attorney Visher.

(Dkt. No. 82 at 7, n.4) (emphasis in original).

By the same token, government counsel have made statements that have proven incorrect as well, namely government counsel's leading the Court to believe that it voluntary refund program had fully succeeded when, thanks to supplemental discovery, we now see how wrong government counsel's suggestion was. By this standard, Attorney Visher's falsehoods to the Court are not so bad. Still, Attorney Visher's manipulation and inaccuracies are a serious concern.

It is an extremely close call whether counsel's lack of candor on these two occasions should disqualify him on representing the class. The Court will go ahead and appoint Attorney Visher as class counsel in light of his dogged pursuit of this case and others like it on behalf of veterans. This order also appoints another counsel, Marie Noel Appel, as to whom the government has raised no objections.

**4. RULE 23(b)(3).**

To qualify for certification under Rule 23(b)(3): common questions must "predominate over any questions affecting only individual members"; and class treatment must be "superior to other available methods for the fair and efficient adjudication of the controversy."

As discussed, certification of a class would be superior because the AAFES's voluntary refund program has failed these 60,557 class members, who have not cashed or received refund checks. While it is true that the refunds are "live" in the sense that the AAFES still honors the refunds, the probability of class members affirmatively coming forward to claim the refunds without any further action by AAFES are low. The class mechanism is necessary to ensure adequate relief for the class.

Here the individual claims are, by class definition, less than $10,000 and the average class member's claim is expected to be $44 (Dkt. No. 140 at ¶ 21). The government has admitted that this is a situation where three-quarters of the putative class are individually due amounts of less than $25. Because of the small relief due each individual member, it is highly

improbable that any single class member would take legal action against the AAFES. Notably, the class in total is allegedly due two million dollars. The class mechanism is necessary here.

As discussed, the predominate issue is whether the AAFES breached its credit-card agreements by using a fixed interest rate instead of variable interests. The commonalities are the contractual provisions governing the finance charges and AAFES's collection actions for delinquent accounts. These commonalities predominate over potential individual differences, which do not pose difficult factual or legal questions and can be readily ascertained (and to some extent, already have been ascertained) using AAFES's own electronic records.

**5.    RULE 23(b)(2).**

Class certification under Rule 23(b)(2) is inappropriate where the "primary relief sought is monetary." *Zinser v. Accufix Research Inst*, 253 F.3d 1180, 1195 (9th Cir. 2001). Because all accounts have already been adjusted, the primary relief sought in this action is monetary for those persons who have not cashed or received their refunds. Certification under Rule 23(b)(2) is therefore inappropriate.

**6.    NATIONWIDE CLASS.**

Venue is proper for a nationwide class. *See Briggs v. United States*, No. 07-5760 WHA, 2009 WL 113387, at *5 (N.D. Cal. Jan. 16, 2009) (Alsup, J.) (discussing in detail nationwide class certification under Little Tucker Act).

**CONCLUSION**

For the reasons stated, the following class is hereby certified:

> Persons (1) from whom AAFES has collected, after July 16, 2003 and through the present date, debt incurred pursuant to an AAFES Credit Agreement; (2) from whom the amount collected exceeded the principal amount of account purchases in all categories plus DPP finance charges permitted by the applicable AAFES Credit Agreement and allowable penalties and administrative fees and; (3) were not sent or have not cashed refund check(s) for the full amount of the interest overcharge(s).

This is limited to the 60,557 persons for whom the AAFES determined were due refunds but who have not yet cashed or received refund checks (Dkt. No. 154 at ¶¶ 28–29). This class does not include any UC claims. This does not include "exception accounts," which were only

14

recently issued refunds. This does not include the approximately 2,900 refunds that were recently issued by the AAFES, as disclosed by the government at the motion hearing. This class does not include Russell's individual claim, for which he undisputedly received a refund. Any class members with claims exceeding $10,000 must expressly opt into the class and waive their claims above $10,000 in order to be included. Attorneys Visher and Appel are appointed as class counsel. By **AUGUST 9, 2012**, the parties are requested jointly to submit an agreed-upon form of notice, a joint proposal for dissemination of notice and the timeline for opting out of the action. Plaintiff must pay for the cost of notice. A precise list of who is in the class shall be provided to the Court by **AUGUST 2, 2012**.

**IT IS SO ORDERED.**

Dated: June 20, 2012.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE